In the Matter of JOSEPH TREMARCO, Respondent, v NEW YORK STATE BOARD OF PAROLE et al., Appellants.

Second Department, June 1, 1982

**APPEARANCES OF COUNSEL**

*Robert Abrams, Attorney-General (Paul Jawin* of counsel), for appellants.

*David Steinberg* for respondent.

MOLLEN, P. J.

On December 17, 1971, the petitioner was sentenced in the Supreme Court, Kings County, to an indeterminate term of imprisonment not to exceed 25 years upon his convictions for attempted murder in the second degree and related offenses. He was subsequently committed to the custody of the New York State Department of Correctional Services. Thereafter, on June 2, 1972, in the United States District Court for the District of New Jersey, the petitioner was sentenced to 16 years' imprisonment upon his conviction for various Federal offenses. He was then returned to a State facility where, pursuant to his District Court conviction, a Federal warrant was lodged against him.

In May, 1976, after his first appearance before the Board of Parole, the petitioner was denied release. His next appearance was scheduled for May, 1978.

On May 5, 1978, two correction officers took the petitioner and another inmate, Albert Victory, out of the Green Haven Correctional Facility to have dental work done. During the course of this trip, Victory managed to escape.

In later explaining the incident, the officers reported that they had been set upon by three masked gunmen who had assisted Victory to make good his escape. The officers further reported that the petitioner had declined to join in the escape and had, in fact, released the correction officers after the gunmen and Victory had departed. It was suggested that the petitioner's actions may well have saved the lives of the correction officers.

As the petitioner's scheduled appearance before the Board of Parole drew near, Prisoners' Legal Services wrote a letter in his behalf to a senior parole officer at the Green Haven Correctional Facility recounting this version of the events of May 5, 1978. In addition, one of the correction officers involved wrote a letter directly to the board giving the same account of the incident. Both correction officers subsequently appeared before a Dutchess County Grand Jury and repeated under oath their version of how Victory had come to escape.

All of this information was before the Board of Parole when it considered the petitioner for release. The petitioner himself appeared before the board and did not dispute the accounts of his heroic role in the incident.

On May 25, 1978, the Board of Parole, acting, *inter alia,* on the basis of reports of the petitioner's conduct during the escape, voted to grant him parole. He was subsequently paroled and was delivered into Federal custody to begin serving his Federal sentence.

On July 8, 1980, the New York State Investigations Commission notified the Chairman of the Board of Parole that newly discovered evidence revealed that the initial version of the escape of Albert Victory had been a fabrication. According to the commission, both correction officers involved had admitted that, after taking Victory and the petitioner to the dentist, they brought them to a motel for a sexual assignation. Victory had entered one of the motel rooms with his girlfriend, and had subsequently escaped. Thereafter, in order to conceal their misconduct, the correction officers had concocted the story of the three masked gunmen. It was then agreed that, in exchange for the petitioner's co-operation in the officers' efforts to suppress the true facts of the incident, they would write letters to the Board of Parole favorable to him.

On July 24, 1980, as a result of the information provided by the Investigations Commission, the Board of Parole voted that, pending a hearing, the parole granted to the petitioner would be temporarily rescinded. On the same date, the petitioner, who was incarcerated at the Federal penitentiary in Lewisberg, Pennsylvania, was notified by mail that "the parole granted to you effective June 30, 1978 by the New York State Board of Parole shall be temporarily rescinded pending a hearing regarding [the] charges [being] brought against you." Accompanying the letter was a "Notice of Rescission Hearing" which set forth four charges and which advised the petitioner of his rights. The notice fixed no hearing date, providing instead that "[a] Rescission Hearing on these matters will be scheduled at an institution under the jurisdiction of the New York State Department of Correctional Services as soon as you are returned to an institution under the jurisdiction of the

N.Y.S. Department of Correctional Services." A letter was also sent to the Warden of the Lewisberg facility advising him that the board had decided to rescind the petitioner's parole, and a detainer warrant was subsequently lodged against the petitioner at Lewisberg.

On or about December 8, 1980, the petitioner was transferred to the Federal Correctional Institution at Otisville, New York. New York authorities first became aware of the petitioner's transfer and his presence in this State when, on April 20, 1981, he commenced this CPLR article 78 proceeding. Thereafter, the authorities moved expeditiously to schedule a rescission hearing, contacting the Warden of the Otisville facility to ascertain his willingness and ability to produce the petitioner. No hearing was ever held, however, as an adjournment was granted pending the determination of the CPLR article 78 proceeding.

In the judgment appealed from, the court granted the petition, vacated the temporary rescission order and directed that the detainer warrant lodged against the petitioner be withdrawn. The court held that the board lacked statutory authority to rescind a parole grant after it had been finalized and had gone in to effect, "at least within the context of the facts in the instant case." (*Matter of Tremarco v New York State Bd. of Parole,* 109 Misc 2d 577, 580.)

The respondents now appeal from the judgment. We reverse.

In our view, the Board of Parole which, as a body, may "[i]n its discretion * * * revoke or modify any of its decisions or determinations" (9 NYCRR 8000.4), has the power, for good cause shown, to rescind a parole grant either prior to its effective date (see *Matter of Hamm v Regan,* 43 AD2d 344, app dsmd 34 NY2d 992; *Godfrey v Preiser,* 80 Misc 2d 361) or thereafter (see *People ex rel. Spinks v Harris,* 53 NY2d 784; *People ex rel. Mirra v Smith,* 83 AD2d 772). Special Term's contrary conclusion was erroneous.

Nevertheless, the petitioner argues that, even if the board did have the power to rescind a parole grant after its effective date, its actions here violated the petitioner's right to a prompt hearing. We disagree.

Although due process ordinarily requires that a parolee, charged with violating the conditions of his parole, receive a prompt revocation hearing (*Morrissey v Brewer,* 408 US 471), it has also been held that the Constitution imposes no obligation upon a parole authority to execute a parole warrant prior to the parolee's release from an intervening incarceration. (See *Moody v Daggett,* 429 US 78.) Nevertheless, in cases involving parole *revocation,* this State has adopted a stricter standard than Federal due process demands. In New York, an incarcerated parolee's right to a prompt revocation hearing must be honored so long as he is " 'in a place subject to the convenience and practical control of the Parole Board.' " (*People ex rel. Walsh v Vincent,* 40 NY2d 1049, 1050.) And, if he is not afforded a prompt hearing, it falls upon the State to carry "the modest burden" of demonstrating that, by reason of his incarceration, the parolee was not subject to the board's convenience and control. (*People ex rel. Gonzales v Dalsheim,* 52 NY2d 9, 15.) This rule has been held to apply even when the parolee against whom the revocation proceeding is brought is incarcerated in an out-of-State Federal facility. (See *Matter of Higgins v New York State Div. of Parole,* 72 AD2d 583.)

Relying on these principles, the petitioner contends that his right to a prompt hearing was violated because the Board of Parole failed to carry the burden of demonstrating that, as an inmate of a Federal institution, the petitioner was not, and could not be brought, within the convenient and practical control of the parole authorities. We reject this argument and hold that, under the unusual circumstances of this case, the petitioner may not avail himself of the benefit of the more strict requirements of New York law applicable in *revocation* cases.

There is, in our view, a significant distinction between parole *revocation* and parole *rescission.* The former generally arises out of allegations that, after having properly been granted a parole, the parolee committed some act or engaged in some conduct which violated the conditions of his parole. Thus, in a *revocation* proceeding, the authorities attempt to take from the parolee the freedom to which, at one time, he was legitimately entitled. In contrast, parole

*rescission* proceedings generally arise when it is discovered that the parole was granted in error. Thus, where parole rescission is sought, the authorities attempt to terminate the parolee's release to which he was never rightfully entitled. (See, e.g., *People ex rel. Spinks v Harris,* 53 NY2d 784, *supra; People ex rel. Mirra v Smith,* 83 AD2d 772, *supra.*)

The requirement for prompt hearings in parole *revocation* cases grows out of a recognition that, once released, a parolee has a legitimate expectation of continued freedom. (See *Morrissey v Brewer,* 408 US 471, 481-482, *supra.*) However, because rescission cases generally involve a parole granted erroneously, as through a miscalculation of time (see *People ex rel. Spinks v Harris, supra*), the parolee's expectation of continued freedom rests solely on the hope that the error will not be discovered. Moreover, in the rare case like the one at bar, the parolee's expectation of freedom depends upon the continued success of his own calculated and intentional fraud perpetrated on the Board of Parole. In such circumstances, it should not lie in the parolee's mouth to extol the inviolability of a parole once granted and the value of freedom once enjoyed, when both were obtained through his own misconduct.

We do not mean to suggest that such a parolee is not to be afforded due process in meeting the allegations made against him. (See *Drayton v McCall,* 584 F2d 1208.) However, as earlier noted, due process does not require a Board of Parole to afford a hearing to a parolee until the conclusion of his term of intervening incarceration. Accordingly, the petitioner's rights here were not violated. We note that, although not required to do so, the board had taken steps aimed at providing a hearing prior to the expiration of the petitioner's Federal sentence. Such hearing should therefore be held with all convenient speed.

MANGANO, GIBBONS and THOMPSON, JJ., concur.

Judgment of the Supreme Court, Dutchess County, dated June 11, 1981, reversed, on the law, without costs or disbursements, and proceeding dismissed on the merits.