13-3592-cv
Victory v. Pataki et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2014

(Argued: November 14, 2014          Decided: February 1, 2016
                                         Amended: February 24, 2016)

Docket No. 13-3592

_____

ALBERT LOPEZ VICTORY,

*Plaintiff-Appellant,*

v.

GEORGE PATAKI, Former Governor of the State of New York in his official
capacity, BRION D. TRAVIS, Ex-Chair, Board of Parole, New York State Division
of Parole, THOMAS P. GRANT, Special Assistant to the Chair of the Board of
Parole, MIKE HAYDEN, Acting Director of the Division of Parole, RONALD P.
WHITE, Director of Upstate Field Operations for the Division of Parole,
TERRANCE X. TRACY, Chief Counsel to the Chair of the Board of Parole,
KENNETH E. GRABER, Commissioner of the Board of Parole, GEORGE
CHARD, Senior Parole Officer, Utica Parole Office, DOUGLAS C. SMITH, Ex-
Supervising Parole Officer, Utica Parole Office, PERRITANO, "JOHN," First
Name Unknown, Parole Officer, Utica Parole Office, KEVIN MCCARTHY, Head
of the Special Services Bureau for the Division of Parole, Central New York Area,
THOMAS MURFITT, Syracuse Police Officer, GILHOOLEY, "JOHN," first name
unknown, Syracuse Police Officer, TIMOTHY FOODY, Ex-Police Chief, Syracuse

Police Department, John Does, 1, 2, 3, etc., Jane Does 1, 2, 3, etc., (whose identities are unknown but who are believed to be either employees of the Division of Parole, the Governor's Office, and/or the Syracuse Police Department); all such individual defendants being sued both in their individual and official capacity, THE CITY OF SYRACUSE, New York, DENNIS DUVAL, Chief of Police of the Syracuse Police Department, GEORGE ALEXANDER, Chair, Board of Parole, in his official capacity, GOVERNOR DAVID PATERSON, RORY D. GILHOOLEY, Syracuse Police Officer, JOHN FALGE, Ex-Police Chief, Syracuse Police Department, GARY MIGUEL, Police Chief, Syracuse Police Department, ELIOT SPITZER, Governor of the State of New York in his official capacity,

*Defendants-Appellees.*

_____

Before: POOLER and PARKER, *Circuit Judges*.[1]

Appeal from the United States District Court for the Western District of New York (Skretny, *C.J.*) granting summary judgment for defendants and dismissing former inmate's claims that various New York State officials and employees violated and conspired to violate his right to due process in connection with the rescission of his grant of parole release. Because we conclude that genuine issues of material fact remain with respect to the personal

---

[1]  The Honorable Richard C. Wesley of the United States Court of Appeals for the Second Circuit was originally assigned as a member of the panel, but recused himself prior to oral argument and did not participate in the appeal. The appeal is being determined by the remaining members of the panel, who are in agreement.  *See* 2d Cir. Local Rules, Internal Operating Procedure E(b); *Murray v. Nat'l Broad. Co.*, 35 F.3d 45, 46 (2d Cir. 1994).

2

involvement of certain Defendants in rescinding the parole, we vacate the district court's dismissal of the due process claim and remand for further proceedings.

Affirmed in part, vacated in part, and remanded.

_____

MYRON BELDOCK, Beldock Levine & Hoffman LLP, New York, NY, *for Plaintiff-Appellant Albert Lopez Victory.*

ANDREW B. AYERS, Assistant Solicitor General, Office of the Attorney General (Eric T. Schneiderman, Attorney General of the State of New York; Nancy A. Speigel, Senior Assistant Solicitor General, *on the brief*), *for* Barbara D. Underwood, Solicitor General, Albany, NY, *for New York State Defendants-Appellees.*

SHANNON T. O'CONNOR, Assistant Corporation Counsel, *for* Robert P. Stamey, Corporation Counsel for the City of Syracuse, Syracuse, NY, *for Syracuse Defendants-Appellees.*

POOLER, *Circuit Judge*:

Plaintiff-appellant Albert Lopez Victory, a former inmate of the New York Department of Corrections and Community Supervision ("DOCCS"), appeals from the August 27, 2013 order of the United States District Court for the Western District of New York (Skretny, *C.J.*), granting summary judgment for

3

Defendants and dismissing his complaint in its entirety. *See Victory v. Pataki*, No. 02-cv-0031, 2013 WL 4539296 (W.D.N.Y. Aug. 27, 2013). On appeal, Victory challenges the dismissal of those claims brought pursuant to 42 U.S.C. § 1983 against various New York State officials and employees ("Defendants") for violating and conspiring to violate his right to due process in connection with the rescission of his grant of parole.[2] Because we conclude that genuine issues of material fact remain with respect to the personal involvement of certain Defendants in rescinding Victory's parole, we vacate the district court's dismissal of the due process claim and remand for further proceedings.

---

[2] We initially disposed of this appeal in a summary order issued on April 17, 2015. *See Victory v. Pataki*, 609 Fed. App'x 680 (2d Cir. 2015). Because we conclude that publication is warranted, we now withdraw our original order for the purposes of converting a portion of its holding into an opinion. Though this opinion provides greater detail with respect to the reasoning underlying our original disposition—particularly with regard to Victory's liberty interest—our holding on the merits of this issue is substantially the same as the original order. In an accompanying order, we address and reject Victory's remaining arguments that the district court erred in dismissing his equal protection and Fourth Amendment claims.

4

## BACKGROUND

### I. __Incarceration__

In 1970, Victory entered DOCCS custody to serve a sentence of twenty-five years to life upon his conviction of felony murder, stemming from his involvement in the 1968 shooting death of a police officer. *See People v. Bornholdt*, 305 N.E.2d 461 (N.Y. 1973) (upholding conviction); *Victory v. Bombard*, 570 F.2d 66, 70 (2d Cir. 1978) (reversing grant of writ of habeas corpus). In 1978, while away from Greenhaven Correctional Facility for dental treatment, Victory's guards permitted him to enter a hotel room with his girlfriend, unshackled. *See Tremarco v. N.Y. State Bd. of Parole*, 450 N.Y.S.2d 544, 545 (2d Dep't 1982). Victory escaped and remained at large for three years until he was apprehended in California in 1981.[3] *See Victory v. Coughlin*, 568 N.Y.S.2d 186, 186-87 (3d Dep't 1991).

---

[3] Victory was listed among the Federal Bureau of Investigation's "Ten Most Wanted Fugitives" for approximately one year, between 1980 and 1981. During his time as a fugitive, Victory married his wife, and a child was born to them in 1980. *See Victory*, 568 N.Y.S.2d at 186-87.

Defendants do not dispute that Victory behaved as a model prisoner throughout the 21 years he was incarcerated following his return to DOCCS custody. Victory obtained three college degrees, participated in numerous educational programs, and received commendations from DOCCS on four occasions.

## II. **Parole Release Hearings**

Victory first became eligible for parole release in 1997. After his first application was denied, Victory appeared on two more occasions before a two-member panel of the Board of Parole, but neither panel could reach a consensus and the decision was deferred. At each of these hearings, Victory's escape from Greenhaven was briefly discussed.

On January 11, 1999, Victory was considered for parole release for a fourth time by a two-member panel consisting of Commissioners Kenneth Graber and Lawrence Scott. The record before the Parole Board included the unequivocal recommendations of eight correctional officers, with no letters in opposition. Although the Board of Parole had solicited letters from the District Attorney's office in 1995, before Victory became eligible for parole, no letters from the judge

or prosecutors in his criminal case had been received. At that hearing, Commissioner Graber assured Victory that the panel had reviewed all the documents in his file, stating:

> We have reviewed your documents. We're familiar with everything. We may not refer to every single thing, but that doesn't mean we're not aware of it. There is quite a lot here. We could spend a whole day with you, which we can't do. We have reviewed everything. Our questioning is so we can clear up any questions we have.

App'x at 934-35. The information before the panel contained numerous prominent references to Victory's 1978 escape, including a notation in blue stating "escaped and returned," App'x at 859, the statement: "ESCAPE FROM GHCF, 5/5/78, DURING WHICH . . . SUB[J]ECT WAS AT LARGE, FOR 2 ½ YR PERIOD PRIOR TO BEING RETURNED FROM CALIFORNIA," App'x 1227, and a newspaper article about the escape. Although the January 11, 1999 panel, unlike the prior panels, did not explicitly mention Victory's escape, it did address Victory's disciplinary record and it noted that Victory—who had originally been incarcerated for the present offense 27 years earlier in 1968—got married "[t]wenty-one years ago, [in] 1978," App'x at 941, and had "one daughter who is now eighteen," App'x at 943.

7

Following the January hearing, Graber and Scott granted Victory parole. The Board of Parole's decision assigned him an open release date of March 11, 1999 "or earlier."[4] App'x at 1290.

**III.    Rescission**

The core of Victory's due process claim concerns the events precipitating the parole rescission hearing that followed. "The Board's broad discretion to rescind parole is limited only by the requirement that there be substantial evidence of significant information not previously known by the Board." *Diaz v. Evans*, 935 N.Y.S.2d 224, 225 (3d Dep't 2011) (citations omitted); *see* 9 N.Y.C.R.R. § 8002.5(b)(2)(i) (2002). According to Victory, upon learning that the Board of

---

[4] Although New York regulations do not currently define the term "open release date," the regulations in effect at the time that Victory was granted parole provided:

> Where a decision to release an inmate to parole supervision has been rendered, but a satisfactory program has not been developed, an inmate may receive an ODOP (open date own program). Release *shall occur* as soon after such date as a satisfactory program is available. If a program is not developed within six months of the parole release hearing, the inmate will again appear before the board for a reconsideration of his status.

9 N.Y.C.R.R. § 8002.3(f) (emphasis added); *see also De Zimm v. N.Y. State Bd. of Parole*, 524 N.Y.S.2d 851, 851 n.1 (3d Dep't 1988) ("An open parole release date means an inmate may be released as soon after that date as a satisfactory parole program becomes available." (citation omitted)).

Parole had granted Victory parole status, Defendants violated and conspired to violate his right to due process by depriving him of an unbiased panel at his rescission hearing and fabricating a false basis for rescission premised on Commissioner Graber's purported ignorance of Victory's escape. As Defendants acknowledged, Victory's submissions to the district court included "copious allegations" regarding how the rescission process was initiated. State Appellees Br. at 8. Unless otherwise noted, the following allegations are undisputed.

**A. Decision To Convene a Rescission Hearing**

On January 12, 1999, the day after the January panel granted Victory parole, Thomas P. Grant, the Special Assistant to the Chairman of the Board of Parole, received a media inquiry from Court TV requesting the outcome of Victory's parole hearing. Grant then called Terrance X. Tracy, Chief Counsel to Brion D. Travis, Chairman of the Board of Parole, to inform him that Victory had been granted release. Grant testified that he also notified Travis of the parole determination because the case was noteworthy, and that Travis suggested that Grant notify non-party Katherine Lapp, who at that time served as the Governor's Director of Criminal Justice. Grant then called Lapp and conveyed

9

the panel's determination along with the nature of Victory's offense and his history as an escapee. Five minutes later, Lapp called Grant back to request that he immediately send the file that had been before the January 11, 1999 panel to her in Albany via overnight mail. Grant testified that Travis said that Lapp could see the file because of the position she held, and also noted that he wanted Tracy to review the file. Michael Hayden, Deputy Chief of Operations of the Division of Parole, and Ronald White, a Regional Director, arranged for the file to be sent to Lapp.

Throughout the period Victory was eligible for parole release, then-Governor George Pataki espoused a "very strong belief that parole should not be granted to violent felons," of which belief at least everyone in Governor Pataki's "inner circle" was aware. App'x at 785. Defendants concede that Governor Pataki heard about the decision to grant Victory parole, possibly as a result of a call from a reporter. State Appellees Br. at 8. Governor Pataki testified that, upon learning of Victory's grant of parole release, he "made it obvious to people in [his] office [that he] was unhappy with that decision." App'x at 783.

Lapp had never previously been involved in an individual inmate's parole decision. Nonetheless, on January 13, 1999, the day after Grant informed Lapp of the decision, Lapp met with Tracy and Grant to address whether proper procedures had been followed during the parole hearing and noted that the transcript of the January 11 hearing did not mention the escape. In that conversation, Lapp, Tracy, and Grant allegedly discussed Commissioner Graber's ignorance of the 1978 escape as a potential basis for rescission.[5] According to some testimony, during that meeting, Lapp requested that service of the parole decision to Victory be postponed. That instruction was implemented by Hayden. Although Travis knew that Tracy was meeting with Lapp about the parole decision, there is no evidence that Travis knew what was discussed at the meeting.

Also on January 13, Lapp called Assistant District Attorney James Kindler to solicit support for opposing Victory's parole. Kindler testified that Lapp "was

___

[5] It is not clear whether Lapp, Tracy, and Grant investigated whether Scott, the other commissioner at the parole hearing, knew about Victory's escape at the time of the hearing.

seeking information to oppose [Victory's] parole" and he understood that the panel "would need new information." App'x at 896, 902.

Documentary evidence reveals that, early the next day, Kindler researched Victory's escape and then wrote a letter that discussed the escape and strongly opposed Victory's parole.[6] Indeed, although Kindler stated that Lapp did not tell him what was discussed at the parole hearing, his file exclusively contained research about the escape.

However, according to Victory, phone records reveal that no one spoke to Graber until the following day, on January 14, *after* Graber's purported oversight had already been identified as grounds for rescission. Victory therefore alleges that Lapp, Tracy, and Grant concocted a plan at the January 13 meeting to suggest to Graber that he had not previously been aware of the escape, and to use that oversight as grounds for rescinding the January panel's decision to grant Victory parole.

---

[6] Kindler sent a second letter on March 5, providing additional details about Victory's underlying crime. He also notified the lead prosecutor at Victory's trial, District Court Judge John Keenan, of the Board's decision. On March 8, Judge Keenan sent a letter to Governor Pataki opposing Victory's parole, which letter Victory received the next day, on the morning of the March 9 rescission hearing.

Around January 19, Tracy informed Travis that Graber had not been aware of Victory's escape when he granted parole and that Kindler had subsequently sent a letter opposing Victory's release. According to Tracy's deposition testimony, Travis first proposed the rescission hearing. Tracy and Grant then met with Hayden, who testified that he made the decision to convene the rescission hearing. Later that day, a parole officer provided Victory with both a "Certificate of Release to Parole Supervision," marked as void, and a "Notice of Temporary Suspension of Parole Release." App'x at 1097-98.

The initial notice did not inform Victory of the precise grounds for suspension, indicating only that his release was temporarily suspended pending an investigation of new information, pertaining to:

> Information which existed or behavior which occurred prior to the parole release decision, but was not known at the time the Board rendered the decision or had not been verified at the time the Board rendered the decision.

App'x at 1097. On February 3, 1999, the Division of Parole prepared a rescission hearing report, which informed Victory of the "charges" against him. But, as stated in that report:

13

There [were] no charges involving post-decision behavior by the inmate. Rather, after the Board granted an Open Date of 3/11/99 Or Earlier, a letter was received from the New York County District Attorney's Office, the office that prosecuted the inmate for the Instant Offense, containing information that was not available to the Board at the time it made the release decision. The recommendation of the office of the prosecutor had not been received prior to the Board's January, 1999 decision.

App'x at 1126.

## B.  Rescission Hearing

On March 9, 1999, a parole rescission hearing was held before a three-member panel, which included Commissioner Graber. Board assignments were made by the secretary to the Board of Parole. White knew that Graber had been assigned to the panel roughly a month before the rescission hearing was held. However, there is no evidence that White either had the power to change the assignment or knew that Graber was to testify at the hearing.

Graber began by explaining that the rescission hearing was a "due process . . . hearing" with a limited right to counsel, App'x at 809, and which would be more formal than Victory's prior "interviews" for parole release. App'x at 818. Graber further noted, and on several occasions repeated, that the Kindler and Keenan letters and recommendations would not themselves provide

14

grounds for rescission; only the information contained in the letters would be relevant.

The only evidence offered at the rescission hearing on the issue of whether Victory's escape was known to the January panel was Graber's own unsworn statements to this effect:

> I'll make it very clear. The January Panel did not know about this escape. Whether we should have known and whether we somehow missed it and we're bereft in our duty in not finding it is sort of irrelevant. The Panel did not know it. . . . I, for one, did not know it and I can not speak at this point, because Commissioner Scott is not here, however in our conversation it never came up. I know he was the interviewing Commissioner, but I did review as best I could.

App'x at 858.[7]

The panel then unanimously voted to rescind Victory's parole, reasoning that the prosecutors' letters were "new materials" and that the 1978 escape constituted new information "not actually known" by the prior panel:

> The letters from the prosecutors are new materials not available to the prior Panel. [Those letters], together with information in the file actually reviewed by this Panel, indicate that there was information not known by the January 1999 panel in regard to subject's leaving custody for a thirty-four month period between 1978 and 1981. Upon review of the record, this

---

[7] Commissioner Scott testified at his deposition that he reviewed everything in the file and confirmed that, based on the documents contained in that file, he would have been aware of the escape.

15

information was not actually known. The rescission of the prior Board decision is warranted.

App'x at 888-89. Upon reconsideration of the entire record, the panel then determined that release "would be contrary to the safety and well-being of the community." App'x at 889.

**C. Administrative Appeal of Parole Rescission**

On November 8, 1999, the Board of Parole Appeals Unit reversed the March panel's rescission determination, concluding that "[t]he conduct of Commissioner Graber acting as unsworn witness, prosecutor and judge at the rescission hearing so tainted the proceeding that the rescission hearing must be deemed constitutionally insufficient in violation of Mr. Victory's right to due process." App'x at 1215. The Appeals Unit noted that Graber's commentary regarding the prior panel's lack of knowledge of the escape might have supplied substantial evidence to support rescission if it had been entered as proper sworn testimony. However, the Appeals Unit concluded, Graber "was not a sworn witness when he made these pronouncement of 'proof,'" and it was "plainly improper for him to assess his own credibility in rendering a decision." App'x at 1214. Moreover, because "[t]he institutional file contain[ed] numerous references

16

to the escape" and "[t]he escape was also discussed by Mr. Victory with prior Boards[,] [t]he record cannot substantiate a finding that the escape was new information not available to the Board at the January 11, 1999 hearing." App'x at 1214. Critically, the Appeals Unit confirmed that the Kindler and Keenan letters would not constitute "substantial new information" absent evidence that these letters contained factual information that was unavailable to, or possibly unknown by, the prior board. App'x at 1214.

The Appeals Unit therefore remanded for a new rescission hearing to be convened immediately before a panel of three commissioners who lacked any prior involvement in Victory's case.

Before any rehearing transpired, on December 15, 1999, the Wyoming County Supreme Court granted Victory's state habeas petition on the ground that the January panel's decision afforded Victory a protected liberty interest in parole release, of which he had been deprived without the requisite procedural protections and in the absence of any evidence of significant new information. *People ex rel. Victory v. Herbert*, No. 31141 (Sup. Ct. Wyoming Cnty. Dec. 16, 1999) (Dadd, *J.*). The court therefore ordered Victory's immediate release to parole

17

supervision. Victory was released on December 28, 1999—more than nine months after the latest date for his scheduled release.

The Fourth Department subsequently reversed the superior court's order as exceeding its authority. *See People ex rel. Victory v. Herbert*, 716 N.Y.S.2d 254, 255 (4th Dep't 2000) (holding habeas relief inappropriate). Without disturbing the determination that the rescission hearing was procedurally unsound, the Fourth Department reinstituted the Board of Parole's direction to conduct a new rescission hearing. *See id*. at 256. A second hearing was rendered unnecessary, however, by Victory's reincarceration during his intervening release. *See People ex rel. Victory v. Travis*, 734 N.Y.S.2d 749, 751 (4th Dep't 2001).

During his four months on parole, Victory was subjected to "an extraordinarily high level of official scrutiny of his action." *People ex rel. Victory v. Travis*, No. 03-1115, at *18 (Sup. Ct. Clinton Cnty. Mar. 9, 2005) (Feldstein, *J.*). On April 7, 2000, Syracuse police officers arrested Victory for violating a condition of his parole mandating that he not enter any establishment in which alcohol is consumed or served. Victory admitted that he had consumed alcohol at such an establishment, his parole was revoked, and he was sentenced to 60 months'

imprisonment. The Clinton County Supreme Court upheld the revocation

decision, but determined that the punishment was excessive. *People ex rel. Victory*,

No. 03-1115, at *22. Because Victory had already served the majority of this term,

the court ordered that Victory be immediately considered for re-release to parole

supervision.

On October 18, 2005, Victory was released to parole supervision.

## DISCUSSION

Victory alleges that Defendants violated and conspired to violate his right

to due process by depriving him of a neutral decision-maker at his rescission

hearing and fabricating a false basis for rescinding his parole. The district court

concluded that the rescission hearing implicated Victory's right to not be

deprived of liberty without due process and acknowledged that the rescission

hearing was "problematic on a due process level." *Victory*, 2013 WL 4539296, at

*17. It nonetheless granted Defendants' motion for summary judgment on the

grounds that Victory had not raised a genuine issue of material fact as to the

personal involvement of anyone other than Commissioner Graber, who was

protected by absolute immunity. *Id.* Because the district court did not construe all

19

inferences in Victory's favor in assessing personal involvement, we vacate its grant of summary judgment.

**I.** **Standard of Review**

The principles governing summary judgment are well established. We review the district court's grant of summary judgment de novo. *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). In assessing the record to determine whether there is a genuine dispute as to any material fact, we resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material fact genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988).

"In deciding a summary judgment motion, a court must not 'weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.'" *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is

improper." *Rodriguez*, 72 F.3d at 1061. Our review of the record demonstrates that the district court did not correctly apply this standard when it dismissed Victory's complaint.

**II.    Analysis**

**A.     Protectable Liberty Interest**

The first issue before us is whether a New York parole grantee, like Victory, has a liberty interest in his open release date of which he may not be deprived without due process. Consistent with this Court's holding in *Green v. McCall*, 822 F.2d 284 (2d Cir. 1987), we conclude that he does.

The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property without due process of law, and "those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "[S]tandard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout*

21

*v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)).

Liberty interests may arise directly from the Due Process Clause itself or from statutes, regulations, or policies enacted by the state. *Wilkinson*, 545 U.S. at 221-22.[8] "[I]n order to have a protectable liberty interest, a prisoner must have more than a hope or a unilateral expectation of release. 'He must, instead, have a legitimate claim of entitlement to it.'" *Green*, 822 F.2d at 288 (some internal quotation marks omitted) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979)). In distinguishing between those with "a protectible expectation of parole," and those with a "mere hope," *Berard v. State of Vt. Parole Bd.*, 730 F.2d 71, 72 (2d Cir. 1984) (internal quotation marks omitted), that is "too ephemeral, contingent or speculative" to warrant constitutional protection, "[c]onsiderable weight is given to whether the alleged liberty interest is in the nature of 'a bird in the hand' rather than one in the bush," *Pugliese v. Nelson*, 617

---

[8] Consistent with the Supreme Court's guidance in *Sandin v. Conner*, our inquiry does not hinge on "the search for a negative implication from mandatory language in prisoner regulations." 515 U.S. 472, 483 (1995). Here, we focus instead on whether the deprivation involved is "sufficiently like" the deprivation at issue in *Green*, *see Kim v. Hurston*, 182 F.3d 113, 118 (2d Cir. 1999), in that it involved a state-created right of "real substance," *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).

22

F.2d 916, 922 (2d Cir. 1980). As Judge Friendly observed, "there is a human difference between losing what one has and not getting what one wants." *Greenholtz*, 442 U.S. at 10 (quoting Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L. Rev. 1267, 1296 (1975)).

Thus, for a state prisoner who has *not* been granted parole, "[n]either the mere possibility of release, nor a statistical probability of release, gives rise to a legitimate expectancy of release on parole." *Barna v. Travis*, 239 F.3d 169, 171 (2d Cir. 2001) (citations omitted). Rather, a protectable liberty interest arises only if he has "a legitimate expectancy of release that is grounded in the state's statutory scheme." *Graziano*, 689 F.3d at 114 (2d Cir. 2012) (quoting *Barna*, 239 F.3d at 170); *see also Swarthout*, 562 U.S. at 219-20; *Bd. of Pardons v. Allen*, 482 U.S. 369, 377-81 (1987) (holding Montana prisoners had protectable liberty interest in parole created by Montana statute requiring that a prisoner "shall" be released when certain conditions are met). By contrast, once a state prisoner has been released on parole, it is well established that his parole may not be revoked without due process. *See Young v. Harper*, 520 U.S. 143 (1997); *Morrissey v. Brewer*, 408 U.S. 471 (1972). As we explained in *Green*:

23

We perceive a continuum that includes the liberty interests attributable to, in descending order, the parolee, the parole grantee, and the inmate without a parole date ("nongrantee"). Since the [Supreme Court] . . . accepted the proposition that inmates for whom *no* parole date had been set could have some protectable interest, we are hard pressed to believe that that Court would not also find that a protectable interest is possessed by an inmate whose release date has already been set and is less than six months away.

822 F.2d at 289 (emphasis added); *see also Klos v. Haskell*, 48 F.3d 81, 87 (2d Cir. 1995) (describing a continuum ranging from the "denial of a 'unilateral hope' of early conditional release (which does not implicate a liberty interest) and revocation of already-granted *release status* (which does)" (internal citations omitted) (emphasis added)).

We find this reasoning equally applicable in the present context. Unlike a mere applicant for parole, a New York inmate who has been granted an open parole release date has a legitimate expectancy of release that is grounded in New York's regulatory scheme. We therefore conclude that a New York "parole grantee has a protectable liberty interest that entitles him to due process in the

24

[Board of Parole's] parole rescission hearings." *Green*, 822 F.2d at 287; *see Lanier v. Fair*, 876 F.2d 243, 252-53 (1st Cir. 1989).[9]

While Defendants do not dispute that Victory was a parole grantee, they assert that he did not have a protectable liberty interest because New York

___

[9] We note that it appears that every New York court to have addressed the issue has likewise concluded that the grant of an open release date, under New York law, is sufficiently similar to the federal "early release date" at issue in *Green*, 822 F.2d at 285, to give rise to a liberty interest entitled to due process protection. *See Blanche v. Dennison*, 805 N.Y.S.2d 497, 497-98 (4th Dep't 2005) (holding grantee of "open parole release date" was "not afforded the process he was due" where rescission procedures were not observed); *Pugh v. N.Y. State Bd. of Parole*, 798 N.Y.S.2d 182, 184 (3d Dep't 2005) ("[W]here, as here, the Board is considering rescission [of an "open release date"], an inmate's rights to due process are adequately protected if the procedures outlined in 9 NYCRR 8002.5(b)(5) are followed." (citation omitted)); *Brooks v. Travis*, 797 N.Y.S.2d 183, 184 (3d Dep't 2005) (holding due process rights of grantee of open parole release date were not violated where he knowingly and voluntarily waived his right to counsel); *see also Rizo v. N.Y. State Bd. of Parole*, 674 N.Y.S.2d 180, 181 (4th Dep't 1998) ("Although petitioner possessed a liberty interest in his parole release after respondent's original determination, 'the rescission of parole did not violate the due process rights of petitioner' because he 'was represented by counsel and the procedures provided in the parole rescission proceedings were constitutionally sufficient.'" (quoting *Ortiz v. N.Y. State Bd. of Parole*, 668 N.Y.S.2d 823, 827 (4th Dep't 1998)). While persuasive, these cases do not relieve us of our obligation to determine Victory's due process rights under the federal Constitution for ourselves. *See Holcomb v. Lykens*, 337 F.3d 217, 222 n.5 (2d Cir. 2003); *see also Vincent v. Yelich*, 718 F.3d 157, 169 (2d Cir. 2013) ("Federal constitutional standards rather than state law define the requirements of procedural due process . . . ." (alteration omitted)), *cert. denied sub nom. Annucci v. Vincent*, 135 S. Ct. 948 (2015).

25

regulations confer more discretion on the Board of Parole to rescind a prior grant of parole status than did the federal regulations at issue in *Green*. This argument is without merit.

Under 9 N.Y.C.R.R. § 8002.5(b)(2), "parole release may be temporarily suspended or rescinded based upon 'significant information which existed . . . where such information was not known by [the Board of Parole],'" *Raheem v. N.Y. State Bd. of Parole*, 888 N.Y.S.2d 631, 633 (3d Dep't 2009) (first alteration in original) (quoting 9 N.Y.C.R.R. § 8002.5(b)(2)(i)), or "substantial evidence that an inmate has committed 'significant misbehavior' including the violation of a prison disciplinary rule," *Bishop v. Smith*, 751 N.Y.S.2d 82, 83 (3d Dep't 2002) (quoting 9 N.Y.C.R.R. § 8002.5(b)(2)(i)).[10] Although the Board of Parole retains "broad discretion" to rescind a grant of parole, that discretion is limited "by the requirement that there be substantial evidence of significant information not

[10] The New York regulations in effect when Victory's parole was rescinded provided that "[e]vents which may cause the temporary suspension and rescission of a parole release date shall include, but not be limited to: (i) significant information which existed, or significant misbehavior which occurred prior to the rendition of the parole release decision, where such information was not known by the board; or (ii) case developments which occur subsequent to the board's rendition of its decision to grant release," such as, inter alia, "significant misbehavior or a major violation of facility rules." 9 N.Y.C.R.R. § 8002.5(b)(2) (2002).

previously known by the Board." *Diaz* , 935 N.Y.S.2d at 225; *accord Raheem*, 888 N.Y.S.2d at 634 n.1; *Pugh v. N.Y. State Bd. of Parole*, 798 N.Y.S.2d 182, 183 ( 3d Dep't 2005); *see also Costello v. N.Y. State Bd. of Parole*, 994 N.Y.S.2d 39 (2014) (memorandum) (reinstating grant of parole and holding Board of Parole improperly rescinded open release date based on victim impact statements that were first requested after media outcry).

New York regulations provide robust procedural protections "[a]fter an inmate has received a parole release date," which mandate that, before rescinding a prior grant, the Board of Parole must provide the inmate with, inter alia, notice of "the specific allegations which will be considered" as a basis for rescission and a hearing at which the grantee is afforded the right to be represented by counsel, the right to present witnesses and introduce documentary evidence, and, ordinarily, the right to cross-examine adverse witnesses. 9 N.Y.C.R.R. § 8002.5 (2002). Furthermore, "[i]f a majority of the members of the board conducting the hearing are not satisfied that substantial evidence exists to form a basis for rescinding the grant of release, the board shall cancel the suspension and reinstate the inmate's original release date or, if that

27

date has past, release shall occur as soon thereafter as is practicable." 9 N.Y.C.R.R. § 8002.5(d)(2) (2002).[11]

These restrictions are not meaningfully different from those at issue in *Green*, 822 F.2d at 289. In *Green*, federal parole regulations permitted the Commissioner to "reconsider any case prior to release," and to rescind a parole grantee's release date based on "disciplinary infractions and allegations of new criminal conduct occurring after the setting of a parole date," or "receipt of new and significant adverse information." 28 C.F.R. § 2.28(b), (e) (1986); *see also Iuteri v. Nardoza*, 732 F.2d 32, 35 n.3 (2d Cir. 1984); *Drayton v. McCall*, 584 F.2d 1208, 1210 n.3 (2d Cir. 1978). Here, as in *Green*, the legislature vested the Board of

[11] In light of these detailed regulatory guidelines, the Supreme Court's decision in *Jago v. Van Curen*, 454 U.S. 14 (1981), is inapt. In *Jago*, the Court ruled that an Ohio state prisoner who had been granted an early parole date did not have a protectable liberty interest based on "mutually explicit understandings." Critical to the outcome of that case was the Sixth Circuit's acknowledgement that Ohio parole authorities retained unbridled discretion to rescind parole up until the time of release and that "'[t]he statutes which provide for parole do not create a protected liberty interest for due process purposes.'" *Id.* at 16 (alteration in original) (quoting *Van Curen v. Jago*, 641 F.2d 411, 414 (1981)); *see also State ex rel. Van Curen v. Ohio Adult Parole Auth.*, 345 N.E.2d 75, 75 (Ohio 1976) ("The Adult Parole Authority has no regulation requiring a hearing prior to rescinding the grant of a parole before release."). The wholly discretionary nature of the Ohio parole board's rescission authority is no more analogous to the authority of the New York Board of Parole than it was to the authority of the federal Commissioner in *Green*, 822 F.2d at 289-90. *See also Lanier*, 876 F.2d at 252.

Parole with broad discretion to reconsider a prior grant of a parole release date. But in both cases, that discretion is guided by the requirement that release *must* be granted under given scenarios. "[T]he presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release." *Allen*, 482 U.S. at 376.

"[B]oth the concreteness of the parole grantee's liberty expectation and the objective nature of the findings that must be made before that expectation may be eliminated are characteristics that . . . must be viewed as supporting the existence of a protectable liberty interest." *Green*, 822 F.2d at 289. Because the Board *must* reinstate a parole grantee's prior release status unless there is substantial evidence of significant new information that forms a basis for rescission, a New York parole grantee possesses a liberty interest protected by the Due Process Clause.[12]

---

[12] Our conclusion is not altered by the fact that an inmate with an "open release date" shall be released "as soon after such date as a satisfactory program is available." 9 N.Y.C.R.R. § 8002.3(f) (2002); *see De Zimm v. N.Y. State Bd. of Parole*, 524 N.Y.S.2d 851, 851 n.1 (3d Dep't 1988). To the extent that the approval of a satisfactory program imposes an additional condition on a parole grantee's release, it renders his expectation of release no more contingent than that of the parole grantees in *Green*, 822 F.2d at 287-88, whose release date was "conditioned upon continued satisfactory conduct by the prisoner." 28 C.F.R. § 2.34 (1986).

**B.  Process Due**

Victory does not contest that, in general, the robust procedures established by the New York regulations are constitutionally adequate to protect the liberty interests of parole grantees. Rather, he asserts that Defendants deliberately sought to circumvent New York's procedural protections by depriving him of a neutral decisionmaker at his rescission hearing and entering into an agreement to unlawfully rescind his parole using a fabricated ground for rescission. If proven, these allegations would suffice to establish a violation of his right not to be deprived of liberty without due process.[13]

---

[13] We have held that "there is no constitutional violation (and no available § 1983 action) when there is an adequate postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty," and an Article 78 proceeding is just such a procedure. *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881-82 (2d Cir. 1996) (emphasis omitted). Petitioners may bring Article 78 proceedings to challenge the procedurally improper rescission of an open parole release date. *See, e.g., Diaz*, 935 N.Y.S.2d at 224; *Blanche v. Dennison*, 805 N.Y.S.2d 497 (4th Dep't 2000). However, we are not required on this appeal to consider whether the availability of an Article 78 proceeding bars Victory's claims because defendants failed to raise such an argument. *See DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

## 1. Denial of Impartial Decision-Maker

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Holcomb v. Lykens*, 337 F.3d 217, 223 (2d Cir. 2003) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Even the most minimal guarantees of procedural due process require that the decision be issued by "a neutral and detached hearing body such as a traditional parole board" and supported by at least "some evidence." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (internal quotation marks omitted). Indeed, "the essence of a fair hearing is an impartial decisionmaker." *Surprenant v. Rivas*, 424 F.3d 5, 16 (1st Cir. 2005) (citing *Wolff v. McDonnell*, 418 U.S. 539, 570-71 (1974)). A parole grantee facing rescission is therefore entitled to "a *de novo* hearing before a neutral and detached hearing body." *Green*, 822 F.2d at 287.

It is undisputed that this right was denied to Victory through the concededly "improper involvement of a Parole Board Commissioner" in Victory's rescission hearing. *Victory*, 716 N.Y.S.2d at 256. Indeed, although they differed as to the proper remedy, the Board of Parole Appeals Unit and two New York courts that reviewed the rescission determination agreed that the decision

31

issued following the rescission hearing could not stand "because of the improper involvement of a Parole Board Commissioner acting as unsworn witness, prosecutor and judge at the rescission hearing." *Victory*, 716 N.Y.S.2d at 256 (internal quotation marks omitted).[14] The district court below likewise recognized, "as the state courts have repeatedly pointed out, that the conduct of [Victory's] rescission hearing is problematic on a due process level." *Victory*, 2013 WL 4539296, at *17.

The rescission hearing—and the panel's ultimate grounds for rescission—hinged entirely on whether Victory's 1978 escape from Greenhaven was "actually known" by the January panel. App'x at 888-89. Because the only evidence on this issue was Commissioner Graber's repeated unsworn testimony

---

[14] Victory's partially successful appeal of the rescission determination does not defeat his due process claim. *See Walker v. Bates*, 23 F.3d 652, 657 (2d Cir. 1994) (holding successful administrative appeal did not cure procedural defect in prisoner's disciplinary hearing or preclude Section 1983 action for damages against hearing officer). A claim for denial of procedural due process accrues once an inmate is deprived of his constitutional procedural rights and is deprived of liberty as a result. *See id.* "Once a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 claim." *Patterson v. Coughlin*, 761 F.2d 886, 893 (2d Cir. 1985). Here, Victory remained incarcerated for more than nine additional months after his open release date elapsed solely on the basis of the March 1999 rescission panel's decision.

to this effect, it was impossible for Victory to dispute the facts purported to justify rescission of his grant of parole without impeaching the credibility of the commissioner heading his rescission panel. This procedural infirmity therefore deprived Victory both of his right to an impartial decision-maker and to a decision based on some evidence.

### 2. Fabricated Evidence

Furthermore, "[i]t is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000). "No 'reasonably competent officers could disagree,' that a parole officer can not properly rely on evidence he knows to be false." *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (citations and alteration omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)). Indeed, we have held that Section 1983 liability attaches for knowingly falsifying evidence even where there simultaneously exists a lawful basis for a deprivation of liberty. *See Ricciuti*, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable gives an

33

arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.").

New York regulations afford parole officials broad discretion, but they plainly do "not authorize state officials to rely on knowingly false information in their determinations." *Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th Cir. 1991) (considering Alabama law). Although the procedural protections attached to parole rescission hearings "are in many respects less demanding than those for criminal prosecution, . . . they are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence . . . ." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997).

Victory proffered sufficient evidence to raise a triable dispute as to whether he was knowingly deprived of liberty on the basis of fabricated evidence. As the district court at one point recognized, "there arguably exist issues of fact with regard to whether Graber knew of the escape." *Victory*, 2013 WL 4539296, at *17.[15] Given that the record conclusively establishes that Graber

---

[15] Somewhat contradictorily, the district court later concluded that "all of the testimony corroborates that Graber's failure to note the escape in the parole file when it was readily available was nothing more than a mistake." *Victory*, 2013 WL 4539296, at *20. That characterization hardly views the facts in the light most

34

stated that he did *not* know of the escape, and that this statement provided the grounds for rescission, it follows that a factual dispute exists as to whether Graber lied, and consequently, whether Victory's parole was rescinded on the basis of this lie.

It is undisputed that Graber was not aware of any procedural defects at the January hearing at least until after learning that a high-ranking member of Governor Pataki's administration was investigating his decision, an event that was to his knowledge unprecedented. Furthermore, according to Graber's deposition testimony, the possibility that he failed to consider the escape was first proposed by Tracy, who, in informing Graber about Lapp's investigation, inquired whether Graber knew about Victory's escape. Considering these facts in conjunction with the undisputed evidence that the escape was prominently noted throughout the file that Graber had claimed at the January hearing to have reviewed in its entirety, there is sufficient evidence for a jury to conclude that

---

favorable to the non-moving party as is required on a motion for summary judgment. Of course, a jury evaluating the evidence could find, as the district court suggested, that Graber testified truthfully in denying any awareness of the escape at the January hearing. But for the reasons explained herein, we do not constrain our review to those allegations that are substantiated by the direct testimony of Defendants and other alleged members of the conspiracy.

Graber lied in denying any prior knowledge of Victory's escape. Because a reasonable jury could find against Defendants, there is a genuine issue of material fact on this issue.

Accordingly, Victory proffered admissible evidence, at a minimum, to raise a triable dispute as to whether he was deprived of liberty without due process, in violation of the Fourteenth Amendment.

**C.    Personal Involvement**

The district court's primary reason for granting summary judgment on Victory's due process claim was that he had not proffered sufficient evidence to show personal involvement in the alleged due process violation by any of the named Defendants. After holding that Graber was entitled to absolute immunity, the district court concluded that Victory could not "maintain a constitutional claim arising out of his actions." *Victory*, 2013 WL 4539296, at *17. According to the district court, Victory could not establish personal liability of any Defendant, as required to support a Section 1983 suit for damages, unless he could show that the Defendant "directly participate[d] in the rescission hearing" or entered into a conspiracy to deprive Victory of his constitutional rights. *Id.* As to the

36

conspiracy, the district court concluded that the evidence established that Defendants agreed to no more than reviewing Victory's parole file. *Id.* at *20.

### 1. Absolute Immunity

We affirm the district court insofar as it concluded that Graber was entitled to absolute immunity for any actions taken while performing the quasi-judicial function of deciding whether to rescind Victory's parole. We reject, however, the contention that Graber's absolute immunity automatically serves to shield any other individual who may have been involved in the sequence of events precipitating the initiation of the rescission proceedings.[16]

When determining whether an official receives qualified or absolute immunity, we take "a functional approach," where "the level of immunity 'flows not from rank or title or location within the Government, but from the nature of the official's responsibilities.'" *Scotto*, 143 F.3d at 110 (alteration omitted)

---

[16] Defendants have not asserted that absolute immunity attaches to the functions performed by any of the other named Defendants. Accordingly, we do not opine on whether absolute immunity would bar claims against the individual who possessed the discretionary authority over whether to initiate rescission proceedings, *see Scotto*, 143 F.3d at 112, or to the individual who performed what might be characterized as the quasi-judicial function of assigning Graber to the panel that presided over Victory's rescission hearing, *see Rodriguez v. Weprin*, 116 F.3d 62, 66-67 (2d Cir. 1997).

(quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985)). "[B]ecause absolute immunity detracts from section 1983's broadly remedial purpose, the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* (alteration, citation, and internal quotation marks omitted). Most executive officials receive only qualified immunity, *Cleavinger*, 474 U.S. at 201, and "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). Thus, "[t]he court must conduct 'some factual inquiry' to determine if the duties of the defendants were judicial or prosecutorial, which entitles them to absolute immunity, or administrative, which may entitle them to qualified immunity." *King v. Simpson*, 189 F.3d 284, 288 (2d Cir. 1999) (alteration omitted) (quoting *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987)); *see Scotto*, 143 F.3d at 110-11.

It is well established that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999). "Parole officers also receive absolute immunity

38

for their actions in initiating parole revocation proceedings and in presenting the case for revocation to hearing officers, because such acts are prosecutorial in nature." *Scotto*, 143 F.3d at 111-13. However, absolute immunity does not extend to parole officials and employees when they perform functions outside these narrowly delineated roles, such as "scheduling or making a recommendation." *King*, 189 F.3d at 288; *see Scotto*, 143 F.3d at 112 (holding that state parole officer's conduct was not protected by absolute or qualified immunity when he prepared false parole violation report and recommended arrest warrant issue and parole revocation proceedings be initiated against parolee based on fabricated parole violation); *see also Kalina v. Fletcher*, 522 U.S. 118, 131 (1997) (holding that prosecutor not entitled to absolute immunity when functioning as "complaining witness"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 275-76 (1993) (prosecutor not entitled to absolute immunity when acting in investigative capacity).

We agree with the district court that Graber was entitled to absolute immunity for any actions taken while performing the quasi-judicial function of adjudicating whether to rescind Victory's parole. *Cf. King*, 189 F.3d at 288 (distinguishing *Anton v. Getty*, 78 F.3d 393 (8th Cir. 1996), where the Eighth

Circuit held that a parole commissioner's decision to delay a prisoner's presumptive parole date was adjudicative, and therefore entitled to absolute immunity). However, Graber's absolute immunity does not extend to the alleged fabrication of evidence when performed outside that adjudicatory role, before the initiation of rescission proceedings. *See Scotto*, 143 F.3d at 112. Nor does it protect alleged wrongdoers who, while not performing the function of an adjudicator or an advocate, enlist themselves in a scheme to deprive a person of liberty by rescinding his parole based on grounds known to be fabricated. *See Zahrey*, 221 F.3d at 353; *see also Ricciuti*, 124 F.3d at 130 (holding that there was no protection by immunity for police officer who conspired to fabricate a known false confession and forward that confession to prosecutor); *Coggins v. Buonora*, 776 F.3d 108, 113-14 (2d Cir. 2015) (holding that a police officer who perjured himself before grand jury was not entitled to absolute immunity for lying to the district attorney and knowingly falsifying and omitting material facts from police reports), *cert. denied*, 135 S. Ct. 2335 (2015).

A government official cannot immunize for Section 1983 purposes all unlawful conduct performed prior to and independent of a later immunized act,

40

merely by subsequently engaging in conduct entitled absolute immunity.

*Coggins*, 776 F.3d at 113. This Court explained long ago that the doctrine of absolute immunity does not permit "relating back" absolute immunity afforded for certain subsequent acts to acts of fabrication performed at earlier stages of the proceedings where absolute immunity did not attach. *See Zahrey*, 221 F.3d at 353 n.10.

Accordingly, we reject the district court's categorical conclusion that, due to Graber's absolute immunity, Victory could not maintain a Section 1983 claim arising out of the procedural infirmities at the rescission hearing unless he showed that another Defendant had "directly participate[d] in the rescission hearing" or participated in a conspiracy to deprive him of his rights. *Victory*, 2013 WL 4539296, at *17.

## 2.  Direct Participation of Other Defendants

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Rather, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award

41

of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted). "Because vicarious liability is inapplicable to . . . § 1983 suits," Victory must raise a genuine dispute as to whether "each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (emphasis added). "[P]ersonal involvement is a question of fact," *Farrell*, 449 F.3d at 484 (internal quotation marks omitted), which may preclude summary judgment, *see, e.g.*, *Ricciuti*, 124 F.3d at 129.

Personal involvement may be shown by "direct participation," which requires in this context "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted). Although we reject the district court's conclusion that no one other than Graber directly participated in the procedurally defective rescission of Victory's parole, we hold that there is insufficient evidence that any Defendant who directly participated in the parole rescission process knew of the facts making the process illegal.

In particular, Hayden and White arranged for Victory's file to be sent to Lapp, and there is evidence that Hayden participated in the decision to initiate a rescission hearing. Thereafter, White was involved in arranging the procedural aspects of the rescission hearing. For instance, White received and reviewed the names of the three commissioners assigned to the panel in advance of the rescission hearing. However, there is no evidence that either Hayden or White knew that the basis for the rescission was allegedly false, nor is there evidence that White knew that Graber would have to testify before the very panel on which he was serving, as there is no evidence that White knew the specific basis for the rescission hearing. We therefore conclude that the district court did not err in holding that Victory had not proffered sufficient evidence to support a finding that any Defendant other than Graber directly participated in the alleged due process violation.

### 3. Conspiracy

We agree with Victory that the district court erred in concluding that no rational jury could find that any of the other defendants conspired to violate his right to due process. Although the district court acknowledged that Defendants

43

admittedly participated in multiple conversations regarding the potential

rescission of Victory's parole, the district court found that Victory could not

establish the agreement necessary to sustain a conspiracy claim due to lack of

direct evidence "that these individuals agreed to anything other than reviewing

Plaintiff's parole file." *Victory*, 2013 WL 4539296, at *20. It is axiomatic, however,

that "conspiracies are by their very nature secretive operations that can hardly

ever be proven by direct evidence." *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir.

1994); *see also United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) ("[I]t is a rare

case where all aspects of a conspiracy can be laid bare in court with the precision

of a surgeon's scalpel." (internal quotation marks omitted)). Therefore, in

assessing the evidence supporting Victory's allegations, the district court was not

permitted to rely solely on Victory's failure to show that any of the alleged co-

conspirators had admitted to impropriety.

The district court did not draw all reasonable inferences in Victory's favor

when it concluded that "Graber's failure to note the escape in the parole file

when it was readily available was nothing more than a mistake" and that no

nexus existed "between Lapp, Kindler, Keenan, Grant, Travis, and Tracy

44

discussing Plaintiff's parole file and Graber depriving Plaintiff of an impartial hearing." *Victory*, 2013 WL 4539296, at *20. Crucially, at no point did the district court address the phone records corroborating Victory's contention that the conversation between Lapp, Tracy, and Grant that allegedly identified Victory's escape as a basis for rescission preceded Graber's own purported realization that he had overlooked the escape. Whereas the State Defendants asserted that Graber first became aware of Victory's escape on January 13, 1999, during a phone conversation between Graber, Tracy, and Grant, Victory pointed to phone records indicating that this call could not have occurred until January 14, 1999, the day after admissible evidence suggests that Lapp was already soliciting letters emphasizing the escape and potentially that Lapp requested that service of the parole decision to Victory be postponed. As the district court at one point acknowledged, Victory raised a genuine dispute as to whether Graber lied about his awareness of the escape to the rescission panel. Considering these facts in conjunction with the State Defendants' inconsistent testimony regarding the chain of events preceding the rescission hearing, a reasonable juror could conclude that there was an agreement among Lapp, Tracy, and Grant, who

together prematurely set in motion rescission procedures with this allegedly false pretext in mind. *See Ricciuti*, 124 F.3d at 129. These "inference[s] of impropriety" distinguish Victory's conspiracy allegations from those that we have dismissed on the basis that they are supported only by "unsubstantiated speculation" with no evidence "to suggest anything untoward took place." *Scotto*, 143 F.3d at 115. Accordingly, we conclude that the district court erred in dismissing Victory's due process conspiracy claim against Tracy and Grant.

The district court also dismissed former Governor Pataki and Travis for lack of personal involvement. While the opinion below failed to draw all inferences in Victory's favor in this respect, we nonetheless agree with its ultimate determination that Victory failed to come forth with evidence that would permit a jury to reasonably find that Governor Pataki or Travis were personally involved in depriving Victory of due process or participated in a conspiracy to that effect.

As an initial matter, the undisputed involvement of two high-ranking members of Governor Pataki's staff in the events preceding the rescission hearing is insufficient to establish Governor Pataki's liability because, as noted,

46

"vicarious liability is inapplicable to . . . § 1983 suits." *Iqbal*, 556 U.S. at 676

("Government officials may not be held liable for the unconstitutional conduct of

their subordinates under a theory of respondeat superior." (italics omitted)).

Moreover, while Victory suggests that these staff members were acting pursuant

to Governor Pataki's instruction or request, the evidence proffered shows at most

that the Governor was aware of and displeased by the Board of Parole's decision

to grant Victory release. Based on this evidence alone, a jury would be left to rely

only "on mere speculation or conjecture as to the true nature" of Governor

Pataki's involvement in his staff's subsequent alleged misconduct, for which the

Governor was indisputably not present. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12

(2d Cir. 1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Victory has similarly failed to show that Governor Pataki fostered a policy

or custom that deprived him of due process during his rescission hearing.

Undeniably, there is evidence in the record to suggest that Governor Pataki

promoted a blanket policy opposing parole for violent offenders, but this does

not support the inference that he "created a policy or custom under which

unconstitutional practices occurred." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

47

1995); *see also Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010). Victory does not allege that Governor Pataki generally encouraged his staff to intervene in parole decisions or ratified the rescission procedures employed by the Board of Parole. In fact, Victory repeatedly argued that his treatment was anomalous and that Lapp's involvement in the process was unprecedented. Accordingly, we affirm the district court's dismissal of Governor Pataki for lack of personal involvement.

Similarly, although Victory has set forth evidence that Travis knew of Lapp, Grant, and Tracy's involvement in the rescission process, there is no evidence suggesting that Travis knew of the alleged falsity of the basis for rescission. That is, while Tracy told Travis that the basis for rescission was that Graber did not know about Victory's escape, a jury would be left to improperly speculate that Travis knew this was false. And as with Governor Pataki, even as Tracy's superior, Travis cannot be held liable for Tracy's actions through a respondeat superior theory.

We do not preclude the possibility that there may be some further impediment to Victory's recovery against some of the named Defendants. On remand, the district court may address whether any individual other than Graber

48

was entitled to absolute or qualified immunity. We hold only that Victory has proffered admissible evidence making out the elements of a cognizable due process violation, and that he raised a triable dispute as to the personal involvement of Board of Parole officials Tracy and Grant in that deprivation.

## CONCLUSION

We conclude that it was error for the district court, in reliance on the reasons it gave, to grant the Defendants' motion for summary judgment on Victory's claim that his due process rights were violated in connection with his rescission hearing.

For the foregoing reasons, we REMAND for further proceedings consistent with this opinion.