*Steven Bangs v. Walter William Smith, et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2022

(Argued: May 10, 2023          Decided: October 12, 2023)

No. 22-1353

_____

STEVEN BANGS

*Plaintiff-Appellant,*

-v.-

WALTER WILLIAM SMITH, Commissioner of the New York State Board of Parole,
in his individual capacity; SUSAN KICKBUSH, Superintendent of Gowanda
Correctional Facility, in her individual capacity; KELLY R. VANNOTE, Supervising
Offender Rehabilitation Coordinator, in her individual capacity; MARK ADAMS,
Supervising Offender Rehabilitation Coordinator, in his individual capacity,

*Defendants-Appellees.*

_____

Before:      LIVINGSTON, *Chief Judge*, and RAGGI and NARDINI, *Circuit Judges*.

This case concerns New York's merit time allowance system, pursuant to which prisoners serving indeterminate sentences for certain non-violent offenses can earn "merit time allowances" to reduce their minimum sentences by one-sixth. *See* N.Y. CORR. LAW § 803(1). Once prison staff grant a merit time allowance, the

1

grantee is eligible to appear before the Board of Parole to be considered for discretionary release on the merit eligibility date, which is equal to the expiration of five-sixths of the minimum sentence of incarceration. Plaintiff-Appellant Steven Bangs alleges that Defendants-Appellees, New York prison officials, revoked his merit time allowance and rescinded his merit-based parole release date without a hearing in violation of his procedural due process rights. Bangs appeals from a judgment of the United States District Court for the Western District of New York (Geraci, *J.*) dismissing his complaint on the grounds that Defendants-Appellees were entitled to qualified immunity. Though we recognize that Bangs had a protected liberty interest in his expected merit-based release date, we nonetheless conclude that Defendants-Appellees are entitled to qualified immunity because Bangs's rights were not clearly established at the time of the prison officials' conduct. Accordingly, the judgment of the district court is AFFIRMED.

FOR PLAINTIFF-APPELLANT:      ANDREW STECKER, Prisoners' Legal Services of New York, Buffalo, NY.

FOR DEFENDANTS-APPELLEES:      FRANK BRADY, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Jeffrey W. Lang, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, Albany, NY.

DEBRA ANN LIVINGSTON, *Chief Judge*:

This case concerns New York's merit time allowance system, pursuant to which prisoners serving indeterminate sentences for certain non-violent offenses can earn "merit time allowances" to reduce their minimum sentences by one-sixth. *See* N.Y. CORR. LAW § 803(1). Once prison staff grant a merit time allowance, the grantee is eligible to appear before the New York Board of Parole (the "Parole

Board") to be considered for discretionary release on the merit eligibility date, which is equal to the expiration of five-sixths of the minimum sentence of incarceration. Plaintiff-Appellant Steven Bangs alleges that Defendants-Appellees ("Defendants"), New York prison officials, revoked his merit time allowance and rescinded his merit-based parole release date without a hearing in violation of his procedural due process rights.

Bangs appeals from a judgment of the United States District Court for the Western District of New York (Frank P. Geraci, *Judge*) dismissing his complaint on the grounds that Defendants were entitled to qualified immunity because Bangs's rights in this context were not clearly established. Though we recognize that Bangs had a protected liberty interest in his expected release date once it was granted by the Parole Board, we nevertheless conclude that Defendants are entitled to qualified immunity because Bangs's rights were not clearly established at the time of the prison officials' conduct. In particular, we hold that, although our prior decision in *Victory v. Pataki* recognized the due process rights of parole grantees in New York's state prisons, *see* 814 F.3d 47, 60 (2d Cir. 2016), legal uncertainties introduced by the revocation of Bangs's merit time allowance—an issue this Court has not previously addressed—render qualified immunity

3

appropriate under the circumstances of this case. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

### I. Factual Background

We first explain the operation of the merit time allowance system under New York law, and then describe the allegations in Bangs's complaint, which we accept as true in considering Defendants' motion to dismiss.

### A. New York's Merit Time Allowance System

Depending on the nature of the offense, an individual convicted of a crime under New York law may be sentenced to an "indeterminate" term of imprisonment. An indeterminate sentence of imprisonment consists of a "minimum period of imprisonment" and a "maximum term." N.Y. PENAL LAW § 70.00(1); *see* N.Y. PRACTICE, CRIMINAL LAW § 3:3 (4th ed.) (internal quotation marks omitted). Once a prisoner reaches the minimum term of his imprisonment, he may be "paroled from the institution" at the discretion of the Parole Board, N.Y. PENAL LAW § 70.40(1), which is part of the Department of Corrections and Community Supervision ("DOCCS"), *see* N.Y. EXEC. LAW § 259-b(1). That discretion is guided by the Parole Board's regulations. Prior to a

prisoner's minimum term, the Parole Board conducts an interview and makes a decision regarding release. *See* 9 N.Y.C.R.R. §§ 8002.1, 8002.2. If the Parole Board decides to grant parole release, a parole release date—referred to as an "open release date" or "open date"—is set. *See Victory*, 814 F.3d at 54 n.4.[1]

Before a prisoner is released on parole, the Parole Board may, in certain limited circumstances, reconsider its determination and rescind the prisoner's open date. *See* 9 N.Y.C.R.R. § 8002.5. The process for reconsidering a prisoner's planned release begins when it "come[s] to the attention of the senior parole officer or the parole officer in charge of an institutional parole office that there may be a basis for board reconsideration of a parole release date." *Id.* § 8002.5(b)(1). The parole officer may temporarily suspend the prisoner's release date at that time, notify the prisoner of the suspension, and begin investigating the matter. *Id.* § 8002.5(b)(1), (b)(3). Ultimately, the officer must prepare a "rescission report" detailing the investigation, which is then submitted to a member of the Parole Board. *Id.* § 8002.5(b)(3). In most cases, the Parole Board member must either

---

[1] The "open date" is the earliest date the prisoner may be released, though the release remains contingent on the approval of a supervision plan, which includes residence verification and employment confirmation. *See* Appellees' Br. at 7.

5

hold a rescission hearing or reinstate the parole release date. *Id.* § 8002.5(b)(4)(i)–(ii).

If a rescission hearing is to be held, the prisoner is entitled to a full complement of procedural protections, including notice, a right to counsel, a right to present evidence, a right to confront and cross-examine witnesses, a right to a written statement of the disposition, and a right to an administrative appeal. *Id.* §§ 8002.5(b)(5), (d)(3), (e). At the conclusion of the hearing, the Parole Board may rescind parole only when doing so is justified by "substantial evidence of significant information not previously known by the [Parole] Board." *Victory*, 814 F.3d at 54 (quoting *Diaz v. Evans*, 935 N.Y.S.2d 224, 225 (3d Dep't 2011)); *accord* 9 N.Y.C.R.R. § 8002.5(b)(2)(i). If the Parole Board does not find a basis for rescission, the suspension must be cancelled and the release date reinstated. *See* 9 N.Y.C.R.R. § 8002.5(d)(2).

Under the regulations, there is only one circumstance in which the Parole Board may rescind the prisoner's parole release date without a hearing—namely, if the prisoner has incurred a new indeterminate sentence or received a resentence that extends the minimum term of imprisonment beyond the "pre-existing minimum term." *Id.* § 8002.5(b)(2)(ii)(e), (b)(4)(iii). In that case, the Parole

6

Board must rescind the parole release date and send a written notice to the prisoner. *Id.* § 8002.5(b)(4)(iii).

Although the Parole Board has significant authority to decide whether an eligible prisoner may be released on parole, it does not have the authority to decide when a prisoner becomes eligible for parole consideration. In the first instance, that authority rests with the sentencing court, which, in setting the prisoner's minimum term, also sets his or her parole eligibility release date. *See* N.Y. PENAL LAW §§ 70.00(1), 70.40(1)(a)(i). But that minimum term is not immutable. New York state law provides several avenues for prisoners to receive "time allowances" that—in the cases of an indeterminate sentence—reduce either the prisoner's maximum or minimum term. N.Y. CORR. LAW § 803(1)(a).

At issue in this case is the "merit time allowance," which generally reduces a prisoner's minimum term by one-sixth. *Id.* § 803(1)(d)(i). Prisoners "serving sentences for certain nonviolent crimes may receive merit time allowances" if they "have achieved certain significant programmatic objectives, have not committed any serious disciplinary infractions[,] and have not filed any frivolous lawsuits." 7 N.Y.C.R.R. § 280.1. The merit time allowance is treated as "a privilege" under state law and, accordingly, no prisoner "has the right to demand or require that

7

any such allowance be granted." *Id.* The DOCCS Commissioner is vested with the authority to promulgate "rules and regulations" governing "the granting, withholding, forfeiture, cancellation and restoration of allowances," including merit time allowances. N.Y. CORR. LAW § 803(3). And in accordance with these regulations, the decision of the Commissioner or his designee to grant a merit allowance is "final." 7 N.Y.C.R.R. § 280.4(b)(2). However, the regulations further provide that a "merit time allowance [previously granted] may be revoked at any time prior to an inmate's release on parole if the inmate commits a serious disciplinary infraction or fails to continue to perform and pursue his or her assigned program plan or earned eligibility plan." *Id.* § 280.4(b)(4).

The regulations do not set forth any specific procedures for challenging the revocation of a merit time allowance. However, as New York state courts have recognized, a prisoner may challenge a revocation using the general inmate grievance process and then seek judicial review in a New York State Article 78 Proceeding. *See Beaubrun v. Annucci*, 40 N.Y.S.3d 295, 295 (3d Dep't 2016).

## B. Bangs's Complaint

Bangs began serving an indeterminate prison sentence of three to six years for a non-violent offense on June 23, 2017, at Gowanda Correctional Facility. His

8

parole eligibility release date, on which the minimum term of his sentence would expire, was calculated to be September 16, 2019. On August 5, 2018, prison officials granted Bangs a merit time allowance based on his "successful participation in six months of vocational programming and receipt of a vocational trade certificate, as well as his overall positive institutional record while incarcerated." Joint Appendix ("App'x") 10. Bangs interviewed before the Parole Board and was granted an open date for release to parole supervision on his merit eligibility date of March 13, 2019. The parole release decision that Bangs received included the warning that his release date was "not guaranteed" and a serious disciplinary report or multiple minor disciplinary reports could result in a rescission hearing in which the Parole Board would determine whether to rescind his release date. *Id.* at 10–11.

On February 6, 2019, Bangs was issued an inmate misbehavior report ("MBR") alleging that he handed a can of Spam to another inmate and demanded that it be returned after a corrections officer confiscated it. The MBR charged him with creating a disturbance, refusing a direct order, harassing an employee, and an unauthorized exchange, none of which are "serious disciplinary infractions" under the merit time allowance regulations. *Id.* at 11. A hearing officer held a

Tier II disciplinary hearing, found Bangs guilty of the MBR charges, and sentenced him to 30 days in "keeplock" confinement, during which time he was allegedly locked in his cell for 23 hours per day. *Id.* at 12. As a result of his keeplock status, Bangs was not allowed to attend the pre-high school equivalency class in which he was enrolled. He requested and was permitted instead to participate in a cell study program to continue his coursework.

Shortly after his disciplinary hearing, Defendants-Appellees began a procedure to rescind Bangs's early release date. Specifically, Bangs alleges that on February 14, 2019, while Bangs was still in keeplock confinement, Defendant-Appellee Mark Adams, a supervising offender rehabilitation coordinator at Gowanda Correctional Facility, ordered that Bangs's merit time allowance be revoked. On the same day, Defendant-Appellee Kelly R. Vannote, another supervising offender rehabilitation coordinator at Gowanda Correctional Facility, completed a temporary suspension of parole release form that stated Bangs was "[r]emoved from a required Academic Program due to [keeplock] status for a Tier 2 infraction" and was therefore "not in compliance" with his earned eligibility program. *Id.* at 13. She then notified the Parole Board of the suspension and requested that the release decision be rescinded. Subsequently, on February 21,

2019, Defendant-Appellee Susan Kickbush, the superintendent of Gowanda Correctional Facility, issued a notice that stated Bangs's merit time allowance was revoked due to "poor institutional behavior as it has impacted on [his] progress and participation and/or that of other inmates in programs." *Id.* at 14.

On March 5, 2019, Defendant-Appellee Walter William Smith, Jr., a commissioner of the Parole Board, signed a form ordering the rescission of Bangs's parole release date. Smith checked a box on the rescission form that (inaccurately) stated: "Release rescinded based upon imposition of a new indeterminate sentence(s) or determinate sentence(s), re-release on original indictment, or recalculation of the minimum period of imprisonment where the parole eligibility date of the term exceeds that of the pre-existing minimum." *Id.* at 14. Underneath this printed text, Smith handwrote: "merit certificate was taken back due to discipline." *Id.* Bangs alleges that he later received a revised copy of his parole release decision that stated: "On 3/5/19 at a rescission hearing held at the Buffalo area office of the NYS Parole Board, Commissioner Smith made the following decision: merit certificate was taken back due to discipline." *Id.* at 15. Bangs alleges that no such hearing took place on March 5, 2019, "or on any

11

other date," and that he was never given notice of the specific allegations to be considered as a basis for rescission. *Id.*

Bangs appealed to the Parole Board's Appeals Unit on March 17, 2019, and was notified that his appeal had been administratively closed because, according to the Parole Board's records, Bangs had received an open release date following his October 2018 parole interview.

In accordance with the ordinary process in the absence of a merit time allowance, Bangs interviewed with the Parole Board again on April 30, 2019 and was granted an open date for parole release on September 16, 2019, the expiration of his minimum sentence. On May 31, 2019, Bangs commenced an Article 78 proceeding against DOCCS and the Parole Board in New York State Supreme Court, seeking the reinstatement of his March 13, 2019 open date for parole release and immediate release to parole. He "alleged that the suspension and rescission of his merit parole release date without following the parole rescission procedure and holding a parole rescission hearing violated the regulations of the Board of Parole and DOCCS." *Id.* at 16. DOCCS subsequently restored Bangs's merit time allowance and released him to parole on July 1, 2019. The parties then agreed to discontinue the state court proceeding.

12

## II.  History of the Proceedings

On July 7, 2021, Bangs brought a § 1983 action in the Western District of New York against Smith, Kickbush, Vannote, and Adams in their individual capacities, seeking declaratory and monetary relief for his alleged 110 days of wrongfully prolonged incarceration due to the rescission of his merit-based parole release date without notice and a hearing.   Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

In a May 26, 2022 decision, the district court granted Defendants' motion to dismiss, holding that Defendants were entitled to qualified immunity because Bangs's liberty interest in his release date had not been clearly established.   Citing this Court's decision in *Victory*, 814 F.3d 47, the district court concluded that "Plaintiff possessed a liberty interest in his merit time release date once the parole board granted him parole after the October 2018 hearing" and "could not be deprived of that interest without due process."   *Bangs v. Smith*, No. 21-cv-6475, 2022 WL 1693308, at *5 (W.D.N.Y. May 26, 2022).   However, relying on a recent decision of New York's Fourth Department, *Lown v. Annucci*, 123 N.Y.S.3d 780 (4th Dep't 2020), the district court concluded that "Plaintiff's release on parole was barred by operation of law due to the revocation of his merit time allowance."   *Id.*

13

at 27. Thus, the court reasoned that regardless of whether Bangs received a hearing, the "postponement of his parole was an inevitability" because "[e]ven if the commissioner's revocation [of the merit time allowance] were wrong or unlawful, the parole board did not have any authority to review it, let alone overturn it." *Id.* at 29. Regarding the revocation of the merit time allowance itself, the district court concluded that no binding precedent had established an inmate's liberty interest in merit time allowances under New York law. *See id.* at *7–*9. Thus, the district court dismissed the complaint on the grounds that Defendants were entitled to qualified immunity. *See id.* at *10. This appeal followed.

## DISCUSSION

We review *de novo* a dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). Because Bangs has sued Defendants "under 42 U.S.C. § 1983 for actions taken in the course of their official duties, his lawsuit must overcome the qualified immunity that shields executive officials from such liability." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

14

Like other affirmative defenses, official immunity may be resolved by Rule 12(b)(6) when the facts establishing it are apparent on the face of the complaint. *See Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020).

**I**

"The doctrine of qualified immunity protects 'government officials performing discretionary functions' from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Francis*, 942 F.3d at 139 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[2]  In evaluating a claim of qualified immunity, we determine whether any constitutional right that the defendant allegedly violated "was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).  A right is "clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d

---

[2] In addition to monetary damages, Bangs seeks declaratory relief, which qualified immunity does not bar. *See Sudler v. City of New York*, 689 F.3d 159, 177 (2d Cir. 2012). However, because "[a] declaratory judgment in [Bangs's] favor would not shorten [his] term of imprisonment, since [he has] already been released from prison," his claim for declaratory judgment is moot. *Id.* at 177–78.

Cir. 2022) (internal quotation marks and brackets omitted) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010)). This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (explaining that for a right to be clearly established "existing precedent must have placed the statutory or constitutional question beyond debate" (citation omitted)). For purposes of qualified immunity, "[w]hether the law was sufficiently clearly established is . . . an issue of law that we consider *de novo*." *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018).

The Supreme Court once "instructed courts to conduct a qualified immunity inquiry sequentially, first deciding whether the plaintiff has complained of the violation of a right guaranteed by the Constitution or federal law, and only then assessing whether the right was sufficiently clearly established at the time of the official's actions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). But after this "'rigid order of battle' . . . encountered widespread criticism," the Supreme Court changed course and instead held that "lower courts should 'exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Francis*, 942 F.3d at 140 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Accordingly, we now have the option of "proceed[ing] directly to step two of the analysis, and, [when we] find that qualified immunity applies, avoid[ing] the unnecessary litigation of constitutional issues at step one." *Id.* (internal quotation marks and brackets omitted). Nevertheless, in circumstances that may occur repeatedly but are likely to never "arise in a case in which qualified immunity is unavailable," we may choose to address the merits and thus bring clarity to the law. *Sabir v. Williams*, 52 F.4th 51, 58 n.3 (2d Cir. 2022), *cert. dismissed*, 143 S. Ct. 2694 (2023). Bangs suggests that this is such a case, noting that, because merit time allowances "are only available against sentences for non-violent felonies, which carry relatively shorter sentences, an individual whose previously granted merit parole release date is rescinded will typically be released from custody before a claim for injunctive relief could be litigated to judgment in federal court." Appellant's Reply Br. at 4.

Though we are cognizant of this concern, finding qualified immunity applies, we ultimately do not fully resolve the merits of Bangs's claim. Specifically, though we recognize that Bangs had a liberty interest in his early release once he was granted an open release date by the Parole Board, we decline to specify what protections are constitutionally due. As we discuss in the following section, there are open questions of New York law regarding what procedural protections Bangs should have been provided before his early release date was rescinded. Because the resolution of these questions may render unnecessary any articulation of a constitutionally required minimum, we reserve the issue for another day.

## II

Bangs alleges that Defendants violated his rights under the Due Process Clause of the Fourteenth Amendment by rescinding his early parole date without a hearing. The Due Process Clause prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. We "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures

18

attendant upon that deprivation were constitutionally sufficient." *Francis*, 942 F.3d at 141 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Qualified immunity may operate at either of these steps to bar relief—that is, a plaintiff's damages claim will be dismissed if either his possession of a constitutionally protected interest or his entitlement to greater procedural protections were not "clearly established . . . at the time when the [defendants] engaged in the course of conduct at issue." *Id.* at 149 (internal quotation marks omitted).

We begin with the first step—identifying whether Bangs has plausibly alleged a liberty interest that Defendants have infringed. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citation omitted). The Supreme Court has made clear that "[t]here is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (per curiam). Accordingly, any "liberty interest in

19

parole," to the extent one exists, falls into the second category. *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (per curiam) (internal quotation marks omitted).

Specifically, we have held that a prisoner's interest in parole is protected by the Due Process Clause only where the state has "establish[ed] 'substantive predicates' to govern official decision[-]making," *Rodriguez v. McLoughlin*, 214 F.3d 328, 338 (2d Cir. 2000) (citation omitted), such that the prisoner can be said to "have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Graziano*, 689 F.3d at 114 (quoting *Barna v. Travis*, 239 F.3d 169, 170 (2d Cir. 2001) (per curiam)). In any given case, determining whether a prisoner's "expectancy of release" is sufficient for the prisoner to be "entitled to some measure of constitutional protection" will depend on the "unique structure and language" of the relevant statutory and regulatory regime, generally to "be decided on a case-by-case basis." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979)

This Court first addressed the liberty interests of parole grantees in *Drayton v. McCall*, 584 F.2d 1208 (2d Cir. 1978). In that case, we held that "a federal prisoner whose date of parole has been approved but who has not yet been released from prison" possesses a "justifiable expectation in his freedom" that

20

entitles him to due process before parole can be rescinded. *Id.* at 1209, 1214. Our conclusion rested on the fact that, though the U.S. Parole Commission retained the authority to rescind parole, "[a]ccording to the [Parole] Commission's own regulations," it could only do so "under two narrowly circumscribed conditions," that is, (1) "when the grantee has been found guilty of institutional misconduct," or (2) "when new information adverse to the prisoner and unrelated to prison misconduct is discovered." *Id.* at 1215 (citations omitted). Noting that in both cases "the regulations require[d] compliance with a detailed procedural scheme before the Parole Commission [could] order rescission," we held that these limitations sufficiently limited the Parole Commission's discretion to give rise to a "protected liberty interest." *Id.* at 1215–17.

Nearly a decade later, this Court reaffirmed *Drayton*'s holding in *Green v. McCall*, 822 F.2d 284 (2d Cir. 1987), another case involving the rights of federal parole grantees. There we rejected the argument that *Drayton* was effectively overruled by the Supreme Court's subsequent decision in *Greenholtz*, which held that Nebraska prisoners who had not yet been granted parole release dates possessed only a limited liberty interest in being paroled. *See id.* at 287–89 (discussing *Greenholtz*, 442 U.S. 1). Explaining that *Greenholtz* recognized a

21

distinction between a regulatory scheme that creates only the possibility that parole will be granted and one that affirmatively promises that parole will be extended in the absence of prohibitive findings or circumstances, we concluded that federal parole grantees maintained a sufficiently "concrete[] . . . liberty expectation" so as to support a constitutionally protected due process right. *Id.* at 289; *see Greenholtz*, 442 U.S. at 10 ("The differences between an initial grant of parole and the revocation of the conditional liberty of the parolee are well recognized."). In so doing, we noted that though "the regulations in effect when *Drayton* was decided have since been modified, the pertinent changes have not been substantial," and still required a showing of either misconduct or significant new information. *Green*, 822 F.2d at 287–88.

In *Victory*, we returned once again to the liberty interests of parole grantees, this time addressing grantees who—like Bangs—are in New York's state prison system. Applying our decision in *Green*, we held that New York's parole system similarly provided those granted future parole dates a "legitimate expectancy of release" entitling them to due process. *Victory*, 814 F.3d at 60 (quoting *Graziano*, 689 F.3d at 114). In reaching that decision, we relied on the fact that, "[a]lthough the Board of Parole retains 'broad discretion' to rescind a grant of parole, that

22

discretion is limited [under the relevant regulatory regime] by 'the requirement that there be substantial evidence of significant information not previously known by the Board.'" *Id.* at 61 (quoting *Diaz*, 935 N.Y.S.2d at 225). Concluding that this limitation was not "meaningfully different from those at issue in *Green*," we held that Victory was constitutionally entitled to due process in connection with the rescission of his parole. *Id.* at 62.

By its own terms, *Victory* would seem to make clear that Bangs, as a parole grantee, possessed a liberty interest in his open release date. Indeed, the regulations governing the Parole Board's authority to rescind a release date once granted draw no distinction between the rights of a prisoner granted a release date pursuant to a merit time allowance and those of any other parole grantee. *See* 9 N.Y.C.R.R. § 8002.5. Nevertheless, that Bangs's merit time allowance was revoked subsequent to his receipt of the open release date but prior to his actual release gives rise to a complication this Court has not previously addressed. In particular, Defendants argue that the revocation of an inmate's merit time allowance renders him ineligible for parole prior to the expiration of his minimum sentence, even if the Parole Board previously granted him an earlier release date. Appellees' Br. at 35–38. In support of this proposition, Defendants rely on the

23

Fourth Department's decision in *Lown*, which held that maintaining the merit time allowance was a "statutory and regulatory predicate" to early parole release and thus its revocation gave the Parole Board no choice but to rescind the previously granted open release date, "thereby obviating any need for an evidentiary rescission hearing." 123 N.Y.S.3d at 780–83.

In our view, it is not obvious that the Fourth Department's assessment is correct. The relevant regulations explicitly mandate that, except in the case of the imposition of a new sentence by a criminal court, a parole release date may only be rescinded upon a determination by the Parole Board that the rescission is appropriate. *See* 9 N.Y.C.R.R. § 8002.5(b)(4). Indeed, the New York State Court of Appeals has held that even when a grant of parole release is subsequently discovered to have been based on an erroneous computation of the prisoner's parole eligibility date, the Parole Board is vested with final authority to determine whether to rescind or modify its prior parole decision in response. *See Spinks v. Harris*, 53 N.Y.2d 784, 785 (1981); *accord Mirra v. Smith*, 443 N.Y.S.2d 475, 477 (4th Dep't 1981) (same). As such, while it is true that New York law makes eligibility for early parole release contingent on a merit time allowance having been "granted," N.Y. PENAL LAW § 70.40(1)(a)(i), it does not necessarily follow that the

24

revocation of a previously granted allowance renders invalid the Parole Board's prior decision.

Were revocation not to have this invalidating effect, it would be clear that Bangs, as a parole grantee, was similarly situated to the plaintiff in *Victory* and thus in possession of a "protectable liberty interest." 814 F.3d at 60 (internal quotation marks omitted). But given the present legal uncertainty, we cannot at this time say that "every reasonable official would interpret" the relevant regulatory framework in this manner. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *cf. Windsor v. United States*, 699 F.3d 169, 177 (2d Cir. 2012) ("[A]n intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation omitted)), *aff'd*, 570 U.S. 744 (2013). Accordingly, we adopt the assumption that the Parole Board was statutorily required to rescind Bangs's release date once his merit time allowance was revoked, and consider whether Bangs could nonetheless be said to possess a clearly established, constitutionally protected interest in his early release.

To answer this question, we must ask, as we have when previously addressing the due process rights of parole grantees, whether "[t]he regulatory structure . . . justifies the parole grantee's expectation of future liberty" by sufficiently limiting the authority of the relevant officials "to rescind a parole grant." *Drayton v. McCall*, 584 F.2d 1208, 1215 (2d Cir. 1978). [3] Given our assumption that rescission necessarily follows revocation of a merit time allowance, the locus of our inquiry is the regulations, promulgated pursuant to N.Y. CORR. LAW § 803(3), that govern such a revocation. Turning to those regulations, though they vest the DOCCS Commissioner with significant discretion in deciding whether to grant a merit time allowance, they also provide that an allowance becomes "final" once granted and may be revoked only if an inmate either (1) "commits a serious disciplinary infraction," a term defined to refer to behavior resulting in criminal or specified disciplinary sanctions, or (2) "fails to continue to perform and pursue his or her assigned program plan or earned eligibility plan." 7 N.Y.C.R.R. §§ 280.2(b), 280.4(b)(2), 280.4(b)(4). Both

---

[3] As we explained in *Victory*, "[c]onsistent with the Supreme Court's guidance in *Sandin v. Conner*, our inquiry does not hinge on 'the search for a negative implication from mandatory language in prisoner regulations.'" 814 F.3d at 60 n. 8 (quoting 515 U.S. 472, 483 (1995)). Instead, we focus on whether the "deprivation involved . . . a state-created right of 'real substance.'" *Id.* (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

of these criteria are narrowly drawn, substantially limiting the discretion of the DOCCS Commissioner or his designee to revoke an allowance once issued.

Considering these conditions of revocation alongside the parole rescission standards at issue in *Green* and *Victory*, it seems fair to say that Bangs had a "legitimate expectancy of release" no less substantial than the parole grantees in those cases. *Graziano*, 689 F.3d at 114. The revocation criteria are more restrictive than the relatively opened-ended standards we have previously addressed in the parole rescission context—both of which permitted rescission on the basis of essentially any "new and significant adverse information." *Green*, 822 F.2d at 288; *see also Victory*, 814 F.3d at 62. In fact, Defendants concede as much, acknowledging in their brief that "[Bangs] has plausibly alleged that he ha[d] a liberty interest in his merit time allowance after the [Parole] Board . . . granted a release date." Appellees' Br. at 2. Nonetheless, they argue that qualified immunity bars Bangs's claim for monetary relief for the reason that neither this liberty interest nor the constitutional minimum procedure attendant upon its deprivation are clearly established under existing law. Though the question is close, we agree.

Although both *Green* and *Victory* involved substantive restrictions on the relevant parole authority's discretion that are facially less limiting than those governing the DOCCS Commissioner's revocation decision, the parole rescission regulations in those cases required something the revocation regulations at issue here do not—a formal evidentiary hearing. In particular, in *Victory*, we emphasized that "New York regulations provide robust procedural protections '[a]fter an inmate has received a parole release date'" and require that a "majority of the members of the [Parole Board] . . . are . . . satisfied that substantial evidence exists to form a basis for rescinding the grant of release." 814 F.3d at 61–62 (quoting 9 N.Y.C.R.R. § 8002.5). And, while *Green* itself did not discuss the procedural protections afforded in a rescission hearing for federal parole grantees, our opinion in *Drayton* emphasized the "detailed procedural scheme" with which the Parole Commission was required to comply. 584 F.2d at 1215.

The significance of these procedural safeguards should not be overstated. It is the "substantive limits on the authority of state officials," not the "procedural requirements," that "ground[]" a liberty interest. *BAM Hist. Dist. Ass'n v. Koch*, 723 F.2d 233, 236 (2d Cir. 1983) (quoting *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir.1979)); *cf. Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983) ("[A]n expectation

28

of receiving process is not, without more, a liberty interest protected by the Due Process Clause."). That said, state law mandating "procedure may [in certain circumstances] provide significant reasons to infer an articulable [liberty] right meant to be protected." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 771 (2005) (Souter, J., concurring). Consistent with that caveat, in both *Victory* and *Drayton*, we suggested that we viewed the respective state and federal regulations' formal hearing requirements as indicative of "the objective nature of the findings that must be made before" parole could be rescinded. *Victory*, 814 F.3d at 62 (quoting *Green*, 822 F.2d at 289); *see also Drayton*, 584 F.2d at 1215.

The regulatory scheme at issue here lacks this particular indicium of objectivity as it does not provide for any pre-deprivation process for challenging the revocation of a merit time allowance. And while we believe it clear on their face that the revocation regulations require the DOCCS Commissioner to make an "essentially fact-bound" determination, rather than a "subjective appraisal[]," *Green*, 822 F.2d at 288 (citations omitted), to conclude otherwise—particularly in light of the broad discretion over merit time allowances with which the statutory regime as a whole endows the DOCCS Commissioner—falls within the scope of the "breathing room" qualified immunity "gives government officials . . . to make

29

reasonable but mistaken judgments about open legal questions," *Francis*, 942 F.3d at 146 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Given that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *id.* (quoting *al-Kidd*, 563 U.S. at 743), it follows that Defendants are entitled to its protection here.

For similar reasons, we do not agree with Bangs's argument that his liberty interest in maintaining his merit time allowance as a parole grantee was clearly established by the Supreme Court's decision in *Wolff v. McDonnell*, which recognized a protected liberty interest in an inmate's "good time" credits. 418 U.S. 539, 557 (1974). Under the statutory scheme at issue in that case, prisoners received sentence reduction credits for good behavior that, once issued, "were revocable only if the prisoner was guilty of serious misconduct." *Sandin*, 515 U.S. at 478 (citing *Wolff*, 418 U.S. at 557). In contrast, the regulatory scheme at issue here allows revocation in a broader set of circumstance—including whenever an inmate "fails to continue to perform and pursue his or her assigned program plan or earned eligibility plan," 7 N.Y.C.R.R. § 280.4(b)(4)—thus providing greater discretion to the relevant authority.

Qualified immunity is often appropriate when we are asked to extend decisions that "have not set forth clearly-defined standards" and instead have inaugurated doctrinal lineages in which "the cases have proceeded on a case-by-case basis." *Luna v. Pico*, 356 F.3d 481, 491 (2d Cir. 2004); *cf. al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality." (internal citation omitted)). Because *Wolff* does not provide clear guidance for when a less restrictive set of revocation conditions may give rise to a protected liberty interest, even setting aside any other potentially relevant differences between the legal regime at issue in that case and the regime here, we cannot conclude that the Supreme Court's decision in *Wolff* clearly established Bangs's right to due process.

Having concluded that Bangs's liberty interest in his early release date was not so clearly established at the time so as to overcome qualified immunity, we need not go on to discuss what procedural protections were constitutionally due. *See Francis*, 942 F.3d at 140. Nonetheless, we note that—depending on how the New York courts resolve the present uncertainty regarding whether maintaining a merit time allowance remains a predicate to parole release once a release date is granted—the answer to the question of "how much process is due" may be "no

31

more than state law already provides."  As we have discussed, New York law may be read to permit the Parole Board to rescind an early release date only when doing so is found to be appropriate following an evidentiary hearing, regardless of whether a previously awarded merit time allowance has been subsequently revoked.  *See* 9 N.Y.C.R.R. § 8002.5(b)(4).  Had Defendants adopted that view in Bangs's case, he would have benefited from the "robust procedural protections" New York law provides to parole grantees, satisfying due process.  *Victory*, 814 F.3d at 61.  Accordingly, because the subsequent development of the law in this area may render anything we say now as unnecessary "constitutional dicta," *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 56 (2d Cir. 2003), we decline to opine further on the issue at this time.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

32